[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13477

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

SALVADOR MAGLUTA,
a.k.a. Sal,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:99-cr-00583-PAS-1

_____

Before ROSENBAUM, JILL PRYOR, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Defendant Salvador Magluta, a federal prisoner at USP Allenwood, appeals the district court's denial of his motion under 18 U.S.C. § 3582(c)(1)(A) for compassionate release. After careful review, we affirm.

## BACKGROUND

Defendant was indicted in 1999 on multiple counts involving obstruction of justice, witness tampering, bribery, producing perjured testimony, and money laundering.[1] The indictment arose from Defendant's attempts to avoid prosecution as the head of a drug trafficking organization that was active beginning in the 1970s and continuing into the 1990s.

At the time of his indictment, Defendant had a long history of drug-related arrests and convictions. He was convicted of cocaine trafficking in Florida in 1980 and sentenced to serve 14 months in prison, but he failed to report for his sentence and remained at large with an outstanding warrant for several years. Defendant was arrested in California on drug charges in 1985, but he avoided rearrest for his prior Florida cocaine trafficking case by using an alias. Defendant was arrested again in 1987 when an officer

_____

[1] Multiple superseding indictments followed but the charges against Defendant did not materially change.

involved in the California case saw him being interviewed during an ESPN boat racing broadcast using his real name, but he fled after being bonded out of jail and never returned to California to face the charges against him there. He was rearrested in 1988 by a Miami detective who encountered him at a local supply store and recognized him. Defendant tried to avoid the outstanding arrest warrants against him by using an alias, but the detective thwarted Defendant's attempt. Defendant was transported to county jail, but he was released from jail a week later due to an alleged paperwork "error" that he later acknowledged was engineered by a jail employee who owed him a favor. Another arrest warrant was subsequently issued, which Defendant again defied.

By 1991, Defendant was wanted not only in the Florida and California cases but also in federal drug trafficking and currency structuring cases. In October 1991, federal agents captured Defendant at a home in Miami that he had been renting for four years under an alias. Defendant refused to surrender to the federal marshals who arrived at the home to arrest him, but he was apprehended after the marshals fired tear gas into the home and tracked Defendant with the assistance of a police dog. He subsequently was acquitted of the charges against him, but it was later determined that the juror foreperson in that case had been bribed.

Defendant was then charged in a separate case with various false document offenses based on evidence found during the search of his Miami home. Trial in the false documents case began in late January 1997, but Defendant fled the courthouse on February 6,

1997, and he remained at large for several weeks. The trial continued in Defendant's absence, and he was convicted in absentia on all counts.

Police rearrested Defendant on April 13, 1997, in Lake Worth, Florida. When he was arrested Defendant, who had shaved his head and was wearing a wig, claimed to be "Juan Alfonso." A search of his car yielded numerous false identification documents, notes with instructions to associates who were helping Defendant hide from authorities and launder drug proceeds, and two key cards for a room at the Palm Beach Ritz Carlton that were found to contain a small amount of cocaine. Thereafter, Defendant was charged with and convicted of federal charges related to conspiring to commit fugitive harboring, making false statements, using false identification documents, and jumping bond.

While Defendant was in hiding, and after he was apprehended and in custody awaiting trial on the charges described above, federal agents continued their investigation into his drug trafficking activities. Defendant was kept apprised of the investigation by his attorney, Mark Dachs. Dachs advised Defendant on the status of the investigation as well as who was cooperating with police and who was not. Evidence discussed in the PSR suggests that Defendant's associates used the information from Dachs to target potential witnesses against him and his organization for murder. Three potential witnesses were murdered, and attempts were made to murder several other witnesses, during the relevant time frame.

Meanwhile, Defendant continued to run his criminal organization while in custody via fake legal visits with a team of associates, including local lawyers and individuals claiming to be paralegals and private investigators. During the visits, Defendant instructed his associates on payments to make for him using drug proceeds, provided them records of criminal activities to maintain for him, received messages from other conspirators in his organization, and smuggled prohibited items into prison, including Xanax. In addition to substantial money laundering operations, Defendant and his associates used the visits to arrange for bribes of favorable jurors and witnesses and intimidation and harassment of witnesses who were cooperating with the Government. This conduct ultimately resulted in the obstruction of justice, bribery, witness tampering, and money laundering charges against Defendant in this case.

A jury acquitted Defendant of certain charges, but found him guilty of conspiring to obstruct justice, conspiring to resist a court order by transferring millions of dollars in drug trafficking proceeds, obstruction of justice through witness and juror bribery, and multiple counts of money laundering. This Court reversed Defendant's conviction on one count of juror bribery based on an erroneous evidentiary ruling,[2] after which the district court resentenced Defendant, imposing a prison term of 195 years. This sentence was affirmed on appeal, the Supreme Court denied certiorari,

---

[2] *See United States v. Magluta*, 418 F.3d 1166, 1180 (11th Cir. 2005).

and the district court denied Defendant's motion for relief under § 2255.

In December 2020, Defendant filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).[3] As amended by the First Step Act of 2018 (the "First Step Act"), that statute authorizes a district court to reduce a defendant's sentence if the reduction is warranted by "extraordinary and compelling reasons" and if it is consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a) and the applicable Guidelines policy statements. *See* 18 U.S.C. § 3582(c)(1)(A)(i).[4] Defendant filed his § 3582(c) motion with the assistance of counsel, and he has been counseled throughout the proceedings related to his motion below and on appeal.

In support of his motion for compassionate release, Defendant cited his age (66 at the time) and the fact that he had spent many of the last 25 years in solitary confinement at ADX Florence, a supermax facility with limited access to environmental stimulation or social interaction. Defendant was housed at another supermax facility, USP Marion, from 2003 to 2006, after which time he was transferred to ADX Florence when USP Marion was redesignated

---

[3] Defendant first exhausted his administrative remedies by submitting a request for compassionate release to the warden of his facility on July 1, 2020.

[4] Section 3582(c)(1)(A) also authorizes a sentence reduction under certain circumstances if "the defendant is at least 70 years of age," but it is undisputed that Defendant does not yet qualify for compassionate release under that provision. *See* 18 U.S.C. § 3582(c)(1)(A)(ii).

as a medium security prison.  He was transferred to USP Terre Haute in 2010 pursuant to a civil settlement with the BOP that challenged his confinement in extended isolation, but he was returned to ADX Florence in 2013 after staff found two illegal cell phones, one of which was linked to a relative of Defendant's, near Defendant's bunk in a shared cell.  The Government has advised the Court in its appellate brief that Defendant recently was transferred from ADX Florence to USP Allenwood, a high-security prison.

Defendant argued in his motion below that his conditions of confinement at ADX Florence had caused a rapid decline in his physical and mental health, resulting in mental illness, symptoms of dementia, and other deleterious health outcomes.  He also claimed to suffer from medical conditions—including kidney disease, diabetes, hypertension, hypothyroidism, hyperlipidemia, dysmetabolic syndrome, obesity, ulcerative colitis, preglaucoma, dental and gum disease, temporomandibular joint (TMJ) disorder, dyspepsia, and major depressive disorder—that placed him in the highest risk category for developing serious illness or dying if he contracted Covid-19.  Citing his advanced age and his rehabilitative efforts while incarcerated, Defendant stated that he no longer presented a threat to society and that his release at this point would be consistent with the sentencing factors of § 3553(a).

The district court denied Defendant's motion, concluding that he did not establish an extraordinary or compelling reason for his release as required to obtain relief under § 3582(c)(1)(A)(i).  As an initial matter, the court rejected Defendant's claim that his

release was justified by the conditions of his confinement at ADX Florence.  Specifically, the court stated that it lacked authority to consider Defendant's "Eighth Amendment-related claims" per this Court's decision in *United States v. Bryant*, 996 F.3d 1243 (11th Cir. 2021), in which the Court held that relief is only authorized under § 3582(c)(1)(A)(i) based on one of the "extraordinary and compelling reasons" expressly set forth in USSG § 1B1.13—that is, a qualifying medical condition, certain family circumstances, or age-related physical or mental health deterioration.  *See Bryant*, 996 F.3d at 1248.  As to his claim for release based on a qualifying medical condition or age-related deterioration, the court determined that the record evidence did not support such a claim.  Having concluded that Defendant did not establish an extraordinary and compelling reason for his release, the district court did not consider whether his release was consistent with the § 3553(a) sentencing factors.

Defendant appeals, arguing that the district court erred and abused its discretion when it denied his motion for compassionate release.  Specifically, Defendant claims the district court misinterpreted the bases for his motion and misconstrued the record evidence and the applicable Guidelines policy statement when it concluded that his age-related deterioration did not constitute an extraordinary and compelling reason for his immediate release.  Alternatively, Defendant argues this Court should reconsider *Bryant* or disregard it in cases involving an inmate's health decline and premature aging related to unwarranted solitary confinement.  We

find no error in the court's ruling denying compassionate release and thus affirm.

## DISCUSSION

We review de novo whether a defendant is eligible for compassionate release under § 3582(c). *United States v. Giron*, 15 F.4th 1343, 1345 (11th Cir. 2021). Once eligibility is established, we review the denial of a defendant's motion for compassionate release pursuant to § 3582(c) motion for an abuse of discretion. *See id.* "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." *United States v. Harris*, 989 F.3d 908, 911 (11th Cir. 2021) (quoting *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1267 (11th Cir. 2019) (quotation marks omitted)). The abuse of discretion standard allows the district court a "range of choice" that we will not reverse "just because we might have come to a different conclusion had it been our call to make." *See id.* at 912 (quotation marks omitted).

As amended by the First Step Act, § 3582(c)(1)(A) authorizes the district court to grant a defendant's motion for compassionate release if the court finds that: (1) "extraordinary and compelling reasons warrant" such relief and (2) the defendant's early release is consistent with the sentencing factors of § 3553(a) and the "applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The relevant policy statement echoes the statutory requirements, stating that a district court may grant a defendant's motion for compassionate release "if, after considering

the factors set forth in . . . § 3553(a)," the court determines that: (1) "[e]xtraordinary and compelling reasons warrant" the defendant's release and (2) "[t]the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *See* USSG § 1B1.13. *See also Bryant*, 996 F.3d at 1248 (holding that "1B1.13 is an applicable policy statement for all [§ 3582(c)(1)(A)(i)] motions" and that district courts do not have discretion "to develop other reasons that might justify a reduction in a defendant's sentence" (quotation marks omitted)).

The policy statement further identifies three extraordinary and compelling reasons that can authorize a court to grant a motion for compassionate release under § 3582(c)(1)(A)(i). *See* USSG § 1B1.13 comment. n.1(A)-(C). First, a defendant's medical condition can constitute an extraordinary and compelling reason for release if the defendant can show he is suffering either from a "terminal illness" or a "serious physical or medical condition, . . . a serious functional or cognitive impairment, or . . . deteriorating physical or mental health because of the aging process" that "substantially diminishes [his] ability . . . to provide self-care" in prison and "from which he . . . is not expected to recover." USSG § 1B1.13 comment. n.1(A). Second, release is permitted if the defendant is at least 65 years old, has served the lesser of at least 10 years or 75 percent of his sentence, and is experiencing a "serious deterioration in physical or mental health because of the aging process." *See* USSG § 1B1.13 comment. n.1(B). Finally, a defendant's family circumstances can create an extraordinary and compelling reason for release based on the "death or incapacitation of the caregiver of the

defendant's minor child" or the "incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." USSG § 1B1.13 comment. n.1(C). The policy statement also contains a catch-all provision that allows the Bureau of Prisons ("BOP") to identify other extraordinary and compelling reasons for a particular defendant's release, but this Court has held that only the BOP—as opposed to the court—has the authority to decide release is warranted under that provision. *See Bryant*, 996 F.3d at 1263 ("We cannot replace the phrase '[a]s determined by the Director of the [BOP]' with 'as determined by a district court.'").

As discussed, the district court concluded that Defendant was not eligible for relief under § 3582(c)(1)(A)(i) because (1) he could not establish any of the extraordinary and compelling reasons set out in USSG § 1B1.13 and (2) the statute does not authorize compassionate release as a means for redressing Defendant's complaints about his conditions of confinement. We agree with the district court as to the latter point. Defendant's motion below focused on the harsh conditions of his imprisonment—specifically, his prolonged assignment to solitary confinement at ADX Florence—as a reason for his release. In his argument on appeal, Defendant again focuses on his conditions of confinement at ADX Florence, and he adds that his placement in solitary confinement is particularly unfair given that he was convicted of "non-violent offenses that resulted in no actual harm." But as the district court correctly held, § 3582(c)(1)(A)(i) does not authorize an inmate's release based on the conditions of his confinement or the fact that

those conditions are unfair.  Rather, per *Bryant*, compassionate release under § 3582(c)(1)(A)(i) is only authorized based on one of the reasons expressly set out in USSG § 1B1.13: a qualifying medical condition, deterioration related to the aging process, or family circumstances requiring the defendant to act as a caretaker to a minor child, spouse, or registered partner.  *See Bryant*, 996 F.3d at 1265 ("Because [the defendant's] motion does not fall within any of the reasons that 1B1.13 identifies as extraordinary and compelling, the district court correctly denied his motion for a reduction of his sentence." (quotation marks omitted)).

Nor are we authorized to reconsider or limit the application of *Bryant*, as Defendant urges us to do.  In this circuit, a prior panel's holding is binding on all subsequent panels "unless and until it is overruled or undermined to the point of abrogation by . . . the Supreme Court" or by this Court sitting en banc.  *See United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019).  Because *Bryant* has not been overturned by the Supreme Court or by this Court sitting en banc, this Court is bound by it.  *Id.  See also United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) ("Under [the prior panel precedent] rule, a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting en banc.").  Defendant's argument that we should disregard the holding of *Bryant* in this case is thus unavailing.

Proceeding to the three bases upon which relief under § 3582(c)(1)(A)(i) is available per *Bryant*, Defendant did not allege

family circumstances warranting his release and the district court correctly held that he failed to establish a qualifying medical condition or aging-related deterioration. As to the medical condition prong, Defendant cited in his motion below a laundry list of diagnoses, including anxiety, depression, a panic disorder, and a mood disorder.[5] But he did not claim to suffer from a "terminal illness" nor explain how any of his documented medical conditions "substantially diminishe[ed][his] ability . . . to provide self-care" in prison. *See* USSG § 1B1.13. And as the district court pointed out, (1) Defendant's medical records did not show that he was unable to attend to the daily tasks of living in prison, including receiving and taking medication for and otherwise participating in treatment for his mental health issues and (2) while the records documented Defendant's mental illness, they also categorized him as having "no medical restrictions" and as being "cleared for employment opportunities." As such, the district court did not err when it concluded that Defendant's release was not warranted as a result of a qualifying medical condition.

---

[5] As noted, Defendant also argued below that he suffered from various medical conditions that put him at greater risk of severe illness related to COVID-19, but he abandoned that argument by failing to raise it in his appellate brief. *See Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed."). We note further that Defendant did not dispute the Government's data showing low infection and transmission rates among inmates and staff at ADX Florence, the facility that housed Defendant when he filed his motion.

Regarding the aging-related deterioration prong, Defendant argued below that he was entitled to release because of his "rapidly deteriorating" mental and physical health related to his harsh conditions of confinement "exacerbated by his age." The district court acknowledged that Defendant met the first two requirements of the age-related deterioration provision because he was over 65 years old and had served at least 10 years of his prison sentence when he filed his motion. Nevertheless, the court rejected Defendant's argument that he satisfied the third requirement. Specifically, the court found that Defendant "ha[d] not demonstrated . . . a serious deterioration in physical or mental health" that could be attributed to aging.

Defendant relied primarily on his mental health issues to support his aging-related deterioration claim.[6] The district court noted Defendant's documented history of recurring mental health issues, but it found scant evidence as to the severity of any changes in his mental health status. Relevant to this prong of the analysis,

---

[6] Although Defendant cited in his brief below a list of diagnoses and conditions suggesting he was in poor physical health, he did not explain or provide any records to substantiate his claim to have experienced a "serious deterioration in physical health. . . because of the aging process." *See* USSG § 1B1.13 comment. n.1(B). To the extent Defendant intended to pursue a claim based on deteriorating physical health, we note that his medical records suggest several of the physical conditions from which he previously suffered—including hypothyroidism, type 2 diabetes, and kidney disease—were found to be resolved or in remission by 2019. Thus, based on the records it appears that Defendant's physical health had generally improved rather than deteriorated just prior to when he filed his motion.

the court took note of a recent brain scan indicating "senescent changes roughly commensurate" with Defendant's age, but it emphasized that Defendant did not make any claim as to the severity of the changes, which was not evident from the scan.

In addition, the court cited several medical records suggesting that Defendant's own choices played a greater role than did the aging process in causing any deterioration in Defendant's mental health. For example, a 2013 report indicated that Defendant was "feeling very down" but that his mood issue was related to loneliness stemming from being put in isolated housing due to behavioral issues. Similarly, a 2017 report noted Defendant's "lack of willingness to engage in treatment" or to "consider alternative activities to improve his mood [such as] exercise [or] extra time out of [his] cell." The report concluded that while Defendant presented with some depressive symptoms, "his presentation suggest[ed] [an] exaggeration of symptoms, likely as a means to assist with facilitating [his] transfer" from ADX Florence. Along those same lines, the court cited evidence that a March 2019 incident—during which Defendant had put bags of medication in his mouth and had to be restrained to remove them—appeared to be strategic as the medical note regarding the incident related Defendant's statement that this "was the only way he could get anyone to listen to him."

Reviewing the district court's conclusions on appeal, we emphasize that Defendant, as the movant, had the burden of showing a serious, aging-related deterioration in his mental or physical health to obtain relief under this prong of the compassionate

release statute and policy statement. *See United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013). Based on the available medical records, the district court did not err by concluding Defendant failed to meet that burden here. The record evidence as to Defendant's mental health—and particularly the alleged deterioration in his mental health that might be related to the "aging process"—is mixed. Defendant's chronic mental health issues are well-documented in the record, but the issues appear to have been present for most if not all of Defendant's period of incarceration, with fluctuating and episodic symptoms. And as the district court pointed out, several records suggest that Defendant's documented flare-ups or worsening of symptoms were exaggerated by Defendant to further strategic goals or could be attributed to Defendant's own choices rather than to age-related deterioration.

Indeed, only one report from July 2019 suggests that Defendant's mental state was "worsening" or had "deteriorated." The doctor who drafted the report ordered a brain MRI to look for "possible cerebral vascular disease or any other signs that could help explain dementia like symptoms." But neither the July 2019 report nor any other record describes the severity of the deterioration or symptoms. Presumably the March 2019 medication bag incident informed the July 2019 report. But as the district court noted, records concerning that incident suggest it was a strategic effort by Defendant to get someone "to listen to him." Further, the ensuing MRI merely indicated "[s]enescent changes roughly commensurate with [Defendant's] age" and "[t]race chronic small vessel ischemic changes." No serious cerebral vascular disease was noted

in the MRI and Defendant's subsequent medical records do not contain any indication of such disease, or of dementia. Thus, the district court did not err when it determined that on balance Defendant did not meet his burden of showing a serious, age-related deterioration in his mental health.

Nor did the district court erroneously eliminate deterioration related to "rapid aging associated with solitary confinement" as a possible basis for relief under § 3582(c)(1)(A)(i), as Defendant argues on appeal. Again, the applicable policy statement authorizes relief only when an inmate can show that, in addition to meeting the age and time-served requirements, he has suffered deterioration that is both "serious" and related to "the aging process." *See* USSG § 1B1.13 comment. n.1(B). Based on the records described above—in particular, records showing that Defendant's physical health was stable and that his mental health issues were chronic, episodic but not necessarily worsening, and related to factors other than aging—the court simply concluded that Defendant failed to substantiate his claim to be suffering from serious, aging-related deterioration.

Finally, Defendant suggests in his appellate brief that the district court erred by failing to consider whether the § 3553(a) sentencing factors supported his early release. Contrary to Defendant's argument, this Court has held that "a district court need not analyze the § 3553(a) factors if it finds . . . that no extraordinary and compelling reason exists" for granting a motion for compassionate release under § 3582(c). *See Giron*, 15 F.4th at 1347. Here, like in

*Giron*, the district court found that no extraordinary and compelling reason exists to grant Defendant's motion. Thus, it was not necessary for the court to consider the § 3553(a) factors because the lack of an extraordinary and compelling reason foreclosed a sentence reduction in any event. *Id. See also United States v. Tinker*, 14 F.4th 1234, 1237–38 (11th Cir. 2021) (emphasizing that all three requirements must be met to grant relief under § 3582(c)).

## CONCLUSION

For the foregoing reasons, the district court's order denying Defendant's motion for compassionate release under § 3582(c)(1)(A)(i) is **AFFIRMED.**